UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| HOME GAMBLING NETWORK, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | )   2:05-cv-00610-DAE-LRL |
| v. | ) |
| | ) |
| CHRIS PICHE, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

# REPORT & RECOMMENDATION

This matter comes before the court on plaintiffs' Request for an Expedited Status Conference/Evidentiary Hearing Regarding the CWC Defendants' Database (#241). Pursuant to the court's order (#242), defendants timely filed a six-page Response (#243) on August 13, 2010. On August 23, 2010, plaintiffs filed a nineteen-page Reply (#244), in which they asserted detailed legal and factual arguments in support of a demand for default judgment as a sanction against defendants for their alleged wrongful conduct. The court therefore permitted defendants to file a responsive Sur-Reply (#250). Minute Order (#249). On December 7, 2010, the court scheduled a status conference for Wednesday, December 22, 2010. Thereafter, the court conducted an evidentiary hearing on February 17, 2011. The parties submitted post-hearing briefs on March 15, 2011.

**Relevant Background**

This is an action for patent infringement and related state law claims brought by plaintiffs Home Gambling Network, Inc. and Melvin Molnick (collectively "plaintiffs"), alleging that defendants Inversiones VC Dos Mil, S.A., *et al.* (the "CWC defendants") are violating United States Patent No. 5,800,268 (the "Method Patent") by operation of an online gambling website and the production and distribution of online gambling software. On July 10, 2006, plaintiffs filed a First Amended Complaint

(#98), alleging among other things that the CWC defendants infringed its Method Patent through operation of an online gambling website and the production and distribution of online gambling software that permit sports betting, lottery, keno, and bingo games in violation of the parties' agreement. Although recognizing that the CWC defendants were granted the right to sub-license to CWC Resellers, CWC Licensees, and End Users, plaintiffs assert that the CWC defendants sub-licensed its software to its licensees without excluding bingo, keno, lottery and sports betting.

The instant motion stems from a discovery dispute that began with plaintiffs' February 12, 2007 request for production of documents. Plaintiffs' first motion to compel (#147) was filed on July 31, 2007. The court granted plaintiffs' motion (#147) on February 12, 2008, and ordered the defendants to produce all responsive documents by March 11, 2008, with the exception of one item, which was to be produced subject to entry of a protective order. Order (#154).

On March 11, 2008, the CWC defendants provided supplemental responses to plaintiffs' First request for production of documents, in which the CWC defendants claimed to have no responsive documents for some of the requests. Dissatisfied, plaintiffs filed a Motion for Sanctions (#156) on March 31, 2008. On June 27, 2008, the court held a hearing on plaintiffs' motion and again ordered the CWC defendants to produce the materials that were at issue and subject to the February 12, 2008 Order (#154); or defendant Chris Piche ("Piche") was to provide a detailed explanation in a sworn affidavit as to why the documents or other materials had not been produced. Minutes (#168). Moreover, a response that documents did not exist had to be supported by a sufficient explanation. *Id.* The CWC defendants continued to claim that they had no documents to produce.

On September 5, 2008, plaintiffs requested a status conference regarding the progress of discovery. Mot. (#178). A hearing was held on September 22, 2008. Minutes (#183). At that time, the court made explicit its "serious concerns" as to whether the CWC defendants were behaving in the spirit of the Rules of Civil Procedure. *See* Transcript (#186) at 19. The court authorized plaintiffs to depose Piche, who was designated as defendants' person most knowledgeable. The court warned, "if there's somebody else to whom [Mr. Piche] would have to defer, who is not available because he lives

in Costa Rica or he is in parts unknown, then it's up to Mr. Piche to educate himself so that he's able to answer all these questions on all these subjects." *Id.* at 40. On November 3, 2008, Piche was deposed. The deposition revealed that the CWC defendants apparently had construed "documents" to mean only paper documents, and had thus excluded relevant electronically stored information. *See* Reply (#244) at 9.

Plaintiffs once again sought the court's assistance in obtaining the CWC defendants' compliance with the court's Order (#154). On February 9, 2009, they filed a Sealed Status Report regarding Defendants [sic] Non-Compliance with Court Orders (#188), seeking a variety of sanctions pursuant to Rule 37(b)(2) against the CWC defendants for their noncompliance with the court's Order (#154). After full briefing, the court held a hearing on the matter. On July 20, 2009, the court issued its Order (#210) granting plaintiffs' Motion (#188). There the court stated:

> [T]he CWC defendants have abused the discovery process through a pattern of delay, evasiveness and non-compliance with this court orders. Such behavior has forced plaintiffs to invest a substantial amount of time, effort and attorneys fees in a continuing attempt to obtain relevant and useful discovery. Despite repeated document demands and court orders, and repeated assurances that all responsive documents were being produced, the CWC defendants have still not produced relevant and responsive documents during the more than 2-year discovery period. If the CWC defendants had previously been handed less severe sanctions for their failure to produce, one or more of the harsh evidentiary sanctions authorized by Rule 37(b) would now be appropriate. Fairness, however, requires that the CWC defendants be given, and are hereby put on clear notice that their failure to comply with this court's orders will result in severe evidentiary sanctions. The CWC defendants are also given notice that their continued failure to respond fully to plaintiffs' discovery requests will invite the type of sanctions plaintiffs currently seek.[1]

Order (#210) at 9-10.

The CWC defendants filed a Request for Review of Magistrate Judge Decision re #210 Order (#211) on July 31, 2009. The presiding district judge, the Honorable David A. Ezra, held a hearing on the motion (#211) on August 5, 2009. Judge Ezra affirmed Order (#210) and ordered the CWC defendants to comply fully with Order (#154) not later than September 7, 2009, by turning over an

---

[1] The CWC defendants were ordered to pay the reasonable expenses, including attorney's fees and costs, incurred by plaintiffs in making filings ## 147, 150, 156, 157, 160, 173, 178, 188, 194, 195, and 196; conducting the discovery compliance deposition of Piche on November 3, 2008; and preparing for and participating in the September 22, 2008 and March 2, 2009 discovery hearings. Order (#210).

3

"identical mirror image copy of the backup database . . . without any alterations, modifications or deletions, together with any necessary passwords required to access the information contained in the database." *See* Order (#219). At the hearing, he warned defendants, "If it turns out that there is any manipulation of that data in any way, shape or form, the Court will consider that to be not only a civilly punishable matter, but the Court would look at that as a criminally contemptible matter because it would amount to obstruction of justice, if you want to put it in the bluntest way possible." Mot. (#241) at Exh. 1, Transcript of Aug. 5, 2009 Hearing at 13. He explained that should defendants "run into some significant technical difficulty that would require a short extension of that time, then you best file a motion, serve it on counsel, and you better have some expert computer people signing off on it.... I am not going to have any of this chicanery here." *Id.* at 17. While acknowledging that he had bent over backward to be fair, *id.* at 21, Judge Ezra quite explicit: "Warning: Next sanction, judgment for the plaintiff." *Id.* at 17. Minutes of that proceeding were filed that day and a written Order (#219) was issued on August 24, 2009. On August 25, 2009, the CWC defendants took the database offline to make the copy, and the copy was made on September 4, 2009.

Immediately following Judge Ezra's Order (#219), the CWC defendants filed an Emergency Motion to Amend Protective Order (#221), which this court granted on December 7, 2009. The Protective Order (#233) was entered on December 21, 2009. The CWC defendants produced the database on December 29, 2009. On April 15, 2010, plaintiffs' expert, Chris Beall, received a sealed copy of the database from plaintiffs' counsel, Craig A. Marquiz. Beall Aff., Exh. A to Doc. (#240) at ¶ 6. Before he could access the database and analyze its contents, Beall needed certain information, such as what version of Oracle had been used, which Marquiz obtained from defense counsel, Jacob A. Reynolds. After accessing the drive, Beall opened the README file for instructions. The file contained three lines of text. *Id.* at 4. Because Beall had expected more information, he contacted Marquiz to determine if defendants had provided any other instructions. Marquiz confirmed that defense counsel advised that everything necessary to access the database was in the README file. Beall examined the database and concluded that it had been altered, modified, manipulated, or otherwise

4

contained errors. Beall Aff., Exh. A to Doc. (#240) at ¶ 59. Beall based this opinion, at least in part, on various error messages that were generated as the result of certain queries. He stated, for example, that "based upon my ability to extract a portion of data from the CUSTOMER table without obtaining the . . . error messages, I can conclude to a reasonable degree of scientific certainty that the CWC defendants CUSTOMER table has been altered, modified, manipulated or otherwise contains errors." *Id.* at ¶ 59. In his opinion, absent alteration, modification, manipulation or errors, his queries would have generated responsive data absent the error messages. *Id.* at ¶ 60.

Marquiz sent a letter to Reynolds dated May 26, 2010, explaining, "the database behaves as if the two most important tables[2] in the database have been manipulated or tampered with. For example, the database will not allow us to print out or query the table for the players' accounts. As a result, we cannot obtain from the database information such as wagering histories and IP addresses that would allow us to identify and quantify wagers that were made by players in the United States." Exh. C to Dkt. (#240). Marquiz stated that plaintiffs had done their best to eliminate possible alternatives that might explain the behavior of the database, and wanted "to give your client an opportunity to explain what is wrong with the database produced to us, and if there is some crucial configuration information that your client has withheld from us, to give them an opportunity to disclose it." *Id.* On May 27, 2010, Reynolds responded that he was scheduling an appointment with Piche to discuss the matter and further suggested, "If your expert is Oracle certified then that would eliminate some of the concerns and we might have to visit the issue." Exh D. to Dkt. (#240). Marquiz replied that day, noting that Reynolds had failed to address the questions raised in Marquiz's letter. Reynolds responded with a link to a Wikipedia page about Oracle certification and asked once more whether Beall had Oracle database certification. *Id.*

Unable to obtain helpful information from the CWC defendants, plaintiffs addressed the issue

---

[2] These are the CUSTOMERID and USERSESSION tables, which are located in an offline file named, "user12.dbf."

5

with Judge Ezra during a telephonic status conference on July 28, 2010. There, plaintiffs expressed concern that the CWC defendants' database appeared to have been altered, modified, manipulated or produced with errors. Judge Ezra referred the matter to the undersigned. Thereafter, plaintiffs filed their Request for an Expedited Status Conference/Evidentiary Hearing Regarding the CWC Defendants' Database (#241) on August 5, 2010, in which they asked the court to schedule a hearing regarding possible alteration, modification, manipulation or errors within the CWC defendants' database.

On August 13, 2010, the CWC defendants filed a Response (#243), wherein they explained for the first time that the database did contain errors, allegedly resulting from a power failure that occurred while the servers were writing data and/or resulting from several instances when the Oracle database ran out of disk space while writing to its disk drives. Ech. 3 to Response (#243), Piche Decl. at ¶ 5. Because defendants had been advised by counsel to not alter or modify the database in anyway, the database was produced with errors in it. According to Piche, the errors are not the result of tampering but are resident in the database that is used by CWC, "including an error or errors related to the CUSTOMER table. According to Piche, the server was down for a few days in early August 2009, then brought back online until taken offline again on August 25, 2009, to make the mirror image copy ordered by the court.[3] Piche contends that relevant data could still be extracted using appropriate queries, and he provided purported examples of such queries.

Plaintiffs maintain, however, that the database is searchable only if "you limited your search, for example, to certain partial incomplete searches of only a limited number of records." Brief (#260) at 5. This because an "offline" file, user12.dbf, has made certain files inaccessible. Plaintiffs further doubt that defendants produced a copy of their actual production database, because they find it incredible that the CWC defendants were using the corrupted database from August 9, 2009 through August 25, 2009 as Piche claims. The CWC defendants assert that plaintiffs' call for sanctions is nothing more than gamesmanship, and "plaintiffs have never seriously been seeking to obtain discovery

---

[3] Beall determined that the server crashed on August 5, 2009. Brief (#260) at 7. Piche testified that it worked as a production database from August 9, 2009 through August 25, 2009. Tr. (#259) at 112-113.

of facts necessary to their case." Brief (#261) at 2. The CWC defendants further maintain that they have not acted in bad faith, insofar as they produced the drive with errors native to it, in compliance with the Federal Rules and the court's order. Finally, the CWC defendants maintain that relatively few files – approximately 1.4% – are inaccessible and are thus "simply not consequential enough to alter the outcome of the action." *Id.* at 3.

## DISCUSSION

If a party "fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders," including, (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination. Fed.R.Civ.P. 37(b)(2)(A).

A district court also has inherent power to sanction a party or attorney for acting in bad faith, vexatiously, wantonly, or for oppressive reasons. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45-46 & n.10 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S. 772, 766 (1980); *F.J. Hanshaw Enter., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136-1137 (9th Cir.2001); *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than its inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50 (holding that the district court did not abuse its discretion in imposing sanctions under its inherent power where conduct sanctionable under the federal rules "was intertwined with conduct that only the inherent power could address"). Cases involving sanctions under Rule 37 and the court's inherent power may be used "interchangeably."

7

*Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 n. 4 (9th Cir.1990), *cert. denied*, 498 U.S. 1109 (1991). Because a terminating sanction is severe, it may be justified only where there is "wilfulness, bad faith, and fault." *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003). "'Disobedient conduct not shown to be outside the control of the litigant' is all that is required to demonstrate willfulness, bad faith or fault.'"*Henry*, 983 F.2d at 948.

**A. Whether the CWC Defendants Have Wilfully Violated the Court's Orders**

The CWC defendants acknowledge that the database contained errors. They represent, however, that the database was produced with errors in it because counsel had directed them not to alter or modify the database in any way. According to Piche, the errors were not the result of tampering; rather, they were resident in the database and resulted from one or more separate events, including a crash that occurred sometime in early August 2009, when the server lost power while writing to the disk drives. Plaintiffs' expert, Beall, determined that the crash occurred on August 5, 2009, within four hours of Judge Ezra's order to produce the database, and within three hours of the electronic filing of the minutes of the August 5, 2009 hearing and notification of the minutes of the hearing. *See* Brief (#260) at 7.

The source of the alleged power failure is something of a mystery, but the CWC defendants admit that the server was down until August 9, 2009. At the February 15, 2011 hearing, Piche confirmed that the server, which is located in Costa Rica, was connected to a UPS battery backup power supply, which was connected to a stand alone power generator, and the generator was connected to the city's power grid. The UPS backup alone was capable of supplying power to the servers for two hours, but if necessary, the generator could supply ten hours of power when fully fueled.

Piche admitted, however, that there was no general power outage in Costa Rica on August 5, 2009. Nor did the UPS malfunction. Apparently, "all of [the CWC defendants'] other computers and systems continued to operate normally." Tr. (#259) at 120. Piche represented that the CWC defendants contacted the vendor of the equipment, but the vendor could not find any defect that would have caused the server to lose power. Piche had not experienced this issue with any similar equipment. He further testified, "A second reason [defendants think an internal power failure occurred] is that there are

actually some -- some kind of internal log files in the storage area network that I'm not -- I'm not personally -- I don't have an expert level of familiarity with them, but there are some log files inside this storage area network that we looked at, which suggested to us that this had happened. As a matter of fact, I believe that -- it's been awhile, but if I recall correctly I think it was also -- I think our interpretation of the log files was confirmed by Pillar Data, although we couldn't figure out why it had happened. [] Which is why they ended up sending the replacement part." Tr. (#259) at 120.

Courts have the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence. *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993). Common sense dictates that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l International Union, United Auto., Aerospace and Agr. Implement Workers of America (UAW) v. N.L.R.B.*, 459 F.2d 1329, 1335 (9th Cir. 1972). The court also has the inherent power to sanction a party for destroying relevant evidence which it knows or should have known it had a duty to preserve even absent a preservation order. *Leon v. IDX Syst. Corp.*, 464 F.3d 951, 958-59 (9th Cir. 2006).

Here, one reasonably would expect the CWC defendants to promptly notify plaintiffs and/or the court of the alleged four day long equipment failure and damage to the server, particularly in light of Judge Ezra's express warning that the court would consider any manipulation of the data in any way, shape or form, not only a civilly punishable matter, but a criminally contemptible matter that would amount to obstruction of justice. Yet, the CWC defendants did not mention the alleged corrupting event when it occurred on August 5, 2009; nor in connection with their September 2, 2009 motion to amend protective order; nor in their communication with plaintiffs in May 2010, as plaintiffs attempted to ascertain what the problem was with the database; nor even during the July 28, 2010 status conference with Judge Ezra. The first mention of such an event came when they filed their Response (#243) to plaintiffs' Request for a Status Conference (#241), over a year after the power failure allegedly occurred. This despite plaintiffs' continued complaints and Judge Ezra's instructions that if anything should go wrong, defendants better let the court know about it, complete with "computer people" signing off.

9

Even if the court were to assume that the four-day power failure, which began within hours of Judge Ezra's August 5, 2009 order to produce the database, was a complete coincidence, the CWC defendants engaged in wasteful and needless gamesmanship by repeatedly chiding plaintiffs for their choice of expert, and not revealing the alleged power failure until filing its Response (#243) to the motion now before the court. The court need not pause, however, over the prospect that the alleged power failure was a mere coincidence.

At the evidentiary hearing, the CWC defendants produced several expert witnesses, including one in Belarus, to testified telephonically regarding the importance of the offline file, the extent of data it affected, and the ability to recover data. What they didn't do was produce a single witness or declaration from anyone other than Piche to substantiate the power failure story. The CWC defendants' own expert did testify, however, that data loss can be caused by a "hard shutdown," such as where "you pull the plug from the wall." Tr. (#259) at 51. With that kind of shutdown, the "disks literally stop in their tracks," so "a file may remain offline because of the fact it was shutdown hard." *Id.* at 51, 48.

Although Piche admitted he did not have the expertise to explain the issue, he testified it was his belief that the defendants' interpretation of a sudden internal power failure was confirmed by Pillar Data. Yet the defendants provided no expert witness or declaration from such an expert or technician from Pillar Data. Nor did they produce any witness other than Piche to describe or elaborate on the alleged power failure. Notably, Piche was nowhere near the equipment in Costa Rica on August 5, 2009; he was in Vancouver, British Columbia at the time of the alleged equipment failure. Nor did defendants offer witnesses or evidence to explain what might cause such a sudden failure. While defendants' invoices demonstrate that a consultation occurred on August 7, 2009, they do not state what the consultation concerned. *See* Brief (#261) at Ech. L. Given the unexplained failure of the CWC defendants to produce live witnesses or even written declarations concerning the alleged power failure, the court infers that such testimony, if produced, would be unfavorable to them. *Sparkman v. C.I.R.*, 509 F.3d 1149, 1156 (9th Cir. 2007) ("Where the burden of production rests on a party, a court may, at its discretion, presume or infer from that party's failure to call a witness that the testimony the witness

10

would have offered would not favor that party."); *see also Underwriters Labs. Inc. v. NLRB*, 147 F.3d 1048, 1054 (9th Cir.1998) (same).

Based on the foregoing facts and circumstances and the reasonable inferences to be drawn therefrom, the court finds that the CWC defendants' efforts to blame its corrupted server on a coincidental and sudden power failure on August 5, 2009 are unsupported by credible evidence. The court further finds that the CWC defendants took some deliberate action on August 5, 2009, to intentionally corrupt the server at issue in willful defiance of this court's orders. The defendants' argument that they produced a copy of the database as it existed on the date it was copied, September 4, 2009, simply sidesteps the central issue of the circumstances surrounding the August 5, 2009 corrupting event. Moreover, that "only 1.4%" of the files are inaccessible does not ameliorate the issue, inasmuch as it is unknown what import the inaccessible data has in this case. *See Leon v. IDX Sys. Corp.*, 464 F.3d at 960 ("any number of the 2,200 [spoliated] files could have been relevant to IDX's claims or defenses, although it is impossible to identify which files and how they might have been used."). The court further finds that the CWC defendants' noncompliance with the discovery rules and court orders was willful or in bad faith because they knowingly made false statements of material fact to plaintiffs and to the court to conceal their actions. *Cf. Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 151 F.R.D. 346, 351-353 (N.D. Cal.1993) (dismissing a counterclaim as a sanction for willful, bad faith violation of discovery rules where, among other things, the defendant was aware that some of her business records had survived a warehouse fire in legible form and falsely testified about her knowledge of those documents, their existence, and their condition).

**B. Whether Terminating Sanctions Are Appropriate**

In determining whether to impose a case dispositive sanction, the court applies a non-mechanical five factor test: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir.2007); *see*

*Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1056-1057 (9th Cir.1998), *cert. denied*, 526 U.S. 1064 (1999). The first two factors favor the imposition of sanctions, while the fourth factor cuts against a dismissal or default sanction in most cases. Thus, the key factors are the third and fifth factors – prejudice and the availability of lesser sanctions. *Henry v. Gill*, 983 F.2d 943, 948 (9th Cir. 1993) (citing *Wanderer v. Johnson*, 910 F.2d 652, 656 (9th Cir.1990)); *see also Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004) ("Where a court order is violated, the first and second factors will favor sanctions....").

The first factor clearly favors imposing a sanction of dismissal or default. This action was filed in May 2005, discovery commenced in November 2006, plaintiffs first motion to compel (#147) on this issue was filed in July 2007. The court's Order (#154) granting that motion was filed in February 2008. The CWC defendants have yet to comply with that order, despite repeated attempts by plaintiffs and the court to obtain their compliance. Rather, the CWC defendants' disingenuousness, dishonesty, disregard of discovery obligations, and disobedience of court orders undeniably have frustrated the interest in orderly and expeditious resolution of this litigation. *See Pagtalunan v. Galaza*, 291 F.3d 639, 642 (9th Cir. 2002), *cert. denied*, 538 U.S. 909 (2003); *see In re PPA Products Liab. Litig.*, 460 F.3d at 1227 ("Orderly and expeditious resolution of disputes is of great importance to the rule of law. By the same token, delay in reaching the merits ... is costly in money, memory, manageability, and confidence in the process.").

The court's need to manage its docket likewise favors imposition of default. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (noting that "[i]t is incumbent upon us to preserve the district courts' power to manage their dockets without being subject to the endless vexatious noncompliance of litigants" like the plaintiff in that case), *cert. denied*, 506 U.S. 915 (1992). Defendants' ongoing noncompliance with its discovery obligations and this court's discovery orders left plaintiffs with little choice but to bring successive, meritorious motions and the court to conduct repeated status conferences and hearings in an attempt to gain their compliance and deter further noncompliance. Hence defendants' conduct needlessly congested the court's docket, consumed scarce

judicial resources, and multiplied the proceedings in this case. *Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir.1997).

A party suffers prejudice if its opponent's actions "impair [its] ability to go to trial or threaten to interfere with the rightful decision of the case." *Adriana Int'l Corp.*, 913 F.2d at 1412 (holding that the plaintiff's repeated failure to appear at depositions and continuing refusal to comply with court-ordered production of documents interfered with the rightful decision of the case and therefore was prejudicial) (citing *S.E.C. v. Seaboard Corp.*, 666 F.2d 414, 417 (9th Cir.1982)); *see In re Exxon Valdez*, 102 F.3d at 433 (holding that the plaintiffs' failure to respond to discovery and the time consumed in attempting to secure compliance prejudiced defendants). "Standing alone, failure to produce documents as ordered is considered sufficient prejudice to justify" a terminating sanction. *See Anheuser-Busch, Inc.*, 151 F.R.D. at 347, 353-354 (affirming Rule 37 dismissal sanction where the defendant failed to produce relevant documents until two months before trial) (quoting *Adriana Int'l Corp.*, 913 F.2d at 1412); *see also Adriana Int'l Corp.*, 913 F.2d at 1411-1412 (affirming dismissal sanction under Rule 37 due to the plaintiffs' willful "continuing refusal" to comply fully with orders for the production of documents).

When considering prejudice, the court may consider a party's conduct as a whole throughout the discovery process. *Adriana Int'l Corp.*, 913 F.2d at 1412. The record in this case demonstrates a consistent pattern of discovery delay and obstruction by the CWC defendants directed at preventing plaintiffs from obtaining relevant evidence. Defendants' dilatory and obstructive discovery conduct began with their failure to produce documents in response to plaintiffs' requests for production in 2007, and they have willfully violated the court's production orders since that time. *See In re PPA*, 460 F.3d at 1227 ("The law also presumes prejudice from unreasonable delay."). Any number of files, now inaccessible due to defendants' willful obstruction, could have been relevant to the litigation, although now it isn't possible to determine which files and how they affect other relevant data resident on the database. *See Leon*, 464 F.3d at 960 (citing *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir.1988). Defendants' continuing refusal to comply with court-ordered

production, defendants' evasions, and defendants' corruption of the database clearly have interfered with the rightful decision in this case. *Adriana Int'l Corp.*, 913 F.2d at 1412.

The fourth factor – the public policy favoring disposition of cases on their merits – usually weighs against a terminating sanction. *Pagtalunan*, 291 F.3d at 643 (citing *Hernandez v. City of El Monte*, 138 F.3d 393, 399 (9th Cir.1998)). "Although there is indeed a policy favoring disposition on the merits, it is the responsibility of the [nonmoving] party to move towards that disposition at a reasonable pace, and to refrain from dilatory and evasive tactics." *In re Eisen*, 31 F.3d 1447, 1454 (9th Cir.1994) (quoting *Morris v. Morgan Stanley & Co.*, 942 F.2d 648, 652 (9th Cir.1991)). Because the CWC defendants have flouted that responsibility through their ongoing obfuscation and dilatory discovery tactics, the court finds that this factor weighs neither against nor for terminating sanctions.

As for the availability of lesser sanctions, the record in this case reflects that such sanctions have not been successful in reforming defendants' conduct. Defendants have continued to engage willfully in dilatory and obstructive discovery tactics. While a sanction of dismissal would be unfair where a party could not have realized it was in jeopardy of such a severe sanction, *Valley Eng'rs*, 158 F.3d at 1057, here the CWC defendants were warned by both the undersigned Magistrate Judge and the presiding District Judge that they were on the verge of a dismissal sanction. The court previously found, "the CWC defendants have abused the discovery process through a pattern of delay, evasiveness and non-compliance with this court's orders." Order (#210) at 9. The court further explained in its Order (#210), "if the CWC defendants had previously been handed less severe sanctions for their failure to produce, one or more of the harsh evidentiary sanctions authorized by Rule 37(b) would now be appropriate." *Id.* Thus, in the interest of fairness, the court declined to impose one of the harsher Rule 37(b) sanctions but warned that a continued failure to comply with the court's orders or to respond fully to plaintiffs' discovery requests "will invite the type of sanction plaintiffs currently seek." *Id.* Judge Ezra also made clear at the August 5, 2009 hearing, that should the CWC defendants continue on a path of evasiveness and chicanery the next step would be "judgment for the plaintiff." Despite these prior warnings and sanctions, the CWC defendants continued their pattern of delay and non-compliance,

evidencing that lesser sanctions have had little to no effect on defendants' behavior in this case. There is no reason to expect the CWC defendants would respond any more satisfactorily to another round of intermediate sanctions and warnings. *Henry*, 983 F.2d at 948.

Any sanction imposed under Rule 37(b) or the court's inherent power must be "just" and, in order to comport with due process principles, must specifically relate to the particular claim or defense that was at issue in the order to provide discovery. *The Sunrider Corp. v. Bountiful Biotech Corp.,* 2010 WL 4590766 at *32 (C.D. Cal. Oct. 8, 2010) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxite de Guinee*, 456 U.S. 694, 707 (1982)). When a party's failure or inability to comply with a pretrial discovery order was caused "by its own conduct [or] by circumstances within its control," the court may strike the party's answer and render a default judgment as a sanction, consistent with due process, because a permissible presumption [arises] that the refusal to produce material evidence "was but an admission of the want of merit in the asserted defense." *See Adriana Int'l Corp.*, 913 F.2d at 1413 n.6. "A proper application of Rule 37(b)(2) will, as a matter of law, support such a presumption." *Sunrider Corp.*, 2010 WL 4590766 at *32 (quoting *Ins. Co. of Ireland, Ltd.*, 456 U.S. at 706). That presumption is applicable in this case, making entry of a default judgment just, as well as consistent with due process principles.[4]

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that plaintiffs' motion for terminating sanctions should be granted, the CWC defendants' answer should be stricken and a default judgment should be entered against the CWC defendants.

DATED this 12th day of August, 2011.

*/s/ L R Leavitt*

LAWRENCE R. LEAVITT
UNITED STATES MAGISTRATE JUDGE

---

[4] Plaintiffs request additional relief pursuant to 35 U.S.C. §§271 and 285, and an order allowing the plaintiffs to submit information regarding recovery of attorneys' fees. Brief (#260) at 20-24. Those issues are not properly before the court at this time, and are therefore not considered in this report and recommendation.