IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| HOME GAMBLING NETWORK, INC., et al., | ) ) ) | 2:05-cv-00610-DAE-VCF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| CHRIS PICHE, et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER: (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; (2) DENYING PLAINTIFFS' MOTION TO DEFER

Before the Court is the Motion for Summary Judgment (doc. # 312)

brought by Defendants Inversiones VS Dos Mil, S.A. d/b/a casinowebcam.com

("CWC"), Chris Piche, and Eyeball Networks, Inc. (collectively, "Defendants")

and the Motion to Defer or Deny Defendants' Motion for Summary Judgment

(doc. # 323) brought by Plaintiffs Home Gambling Network, Inc. ("HGN") and

Mel Molnick (collectively, "Plaintiffs").  After reviewing the motions and the

supporting and opposing memoranda, the Court **GRANTS** Defendants' Motion for

Summary Judgment and **DENIES** Plaintiffs' Motion to Defer.

<u>BACKGROUND</u>

I.   <u>Factual Background</u>

On September 1, 1998, the United States Patent and Trademark Office issued Patent No. 5,800,268, entitled "Method of Participating in a Live Casino Game from a Remote Location" (the "Method Patent"), to inventor Mel Molnick, who subsequently assigned all rights in the Method Patent to HGN.  (<u>See</u> Doc. # 98 ("FAC") ¶ 12.)  In 2003, Molnick, the President of HGN, contacted CWC to license the Method Patent.  (<u>Id.</u> ¶ 4.)  On November 25, 2003, CWC entered into five license agreements with Plaintiffs, which were superseded by a patent license agreement (the "HGN Contract") on August 10, 2004.  (<u>Id.</u>  ¶¶ 24, 27.)

The HGN Contract granted Defendants a license to use the Method Patent and, in turn, to grant sublicenses to other companies.  (<u>Id.</u> ¶¶ 29–34.)  More specifically, the contract gives CWC "a perpetual, exclusive, royalty-free worldwide license to use the Licensed Technology" and the right "to grant sublicenses therein to CWC Resellers, CWC Licensees, and End Users."  (Doc. # 111-3 ("HGN Contract") § 2.1.)  The HGN Contract also expressly provided that "[n]o further approval or documentation" was "required" from Plaintiffs with respect to the granting of sublicenses.  (<u>Id.</u>)  The HGN Contract further defines "CWC Software" as "any software owned or licensed by CWC, which CWC

2

makes generally available to its customers, and which enables CWC and CWC

Licensees to provide any games over computer networks to end users, <u>excluding</u>

<u>Bingo, Keno, Lottery and all sporting events</u>."  (<u>Id.</u> § 1.4 (emphasis added).)

   Pursuant to the HGN Contract, CWC used the Method Patent in

conjunction with online gambling operations.  (<u>See</u> Doc. # 312-5 ("Piche Decl.")

¶ 3.)  CWC ran a "live webcam casino" (the "Live Casino"), which functioned like

any other casino except that it was outfitted with digital cameras to allow

physically remote customers to view and interact with the casino, which was

located in Costa Rica, through the internet.  (<u>Id.</u>)  Players could access the Live

Casino through the website www.casinowebcam.com.  (<u>Id.</u>)  CWC also ran a

related business that offered licences to third-party online gaming websites,

allowing them to use CWC software to offer live webcam casino gaming without

needing to operate their own "live" casinos.  (<u>Id.</u>)  At all relevant times, CWC's

computer servers, which hosted the online games, and the employees of the Live

Casino were located in Costa Rica.  (<u>Id</u>; <u>see also</u> FAC ¶¶ 5, 7 (admitting that

Defendants are all <u>foreign</u> individuals or entities and that CWC was a Costa Rican

business with its principal place of business in Costa Rica);  Doc. # 274 ("Beall

Decl.") Ex. 1 ¶ 1 (claiming servers recorded time in their local Costa Rica time).)

II. <u>Procedural Background</u>

On July 10, 2006, Plaintiffs filed a First Amended Complaint, alleging, among other things, that CWC infringed their Method Patent through CWC's operation of an online gambling website and its production and distribution of online gambling software, all of which permitted sports betting, lottery, keno, and bingo games.  (FAC ¶¶ 88–89.)  While recognizing that Defendants had the right to grant sublicenses under the HGN Contract, Plaintiffs assert that CWC improperly sublicensed its software without excluding bingo, keno, lottery, and sports betting.  (Id. ¶¶ 112–14.)

On August 10, 2006, Defendants filed a Motion for Summary Judgment on all counts of the First Amended Complaint.  (Doc. # 111.)  On March 30, 2007, the Court issued an Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment.  (Doc. # 143.)  The Court granted Defendants summary judgment as to Count Two (Declaratory Judgment) and Count Seven (Conversion) of the First Amended Complaint.  (Id.)  The Court denied the motion as to Count One (Patent Infringement), Count Three (Preliminary and Permanent Injunction), Count Four (Accounting), Five (Breach of Contract), and Six (Intentional Interference with Contractual Relationships).  (Id.)

Approximately six years later, on February 27, 2013, Defendants filed a second Motion for Summary Judgment, contending that "the record is ripe for

4

summary judgment on the remaining counts of the complaint." (Doc. # 312 at 2.)
On April 12, 2013, Plaintiffs filed a Motion to Defer Defendants' Motion for
Summary Judgment pursuant to Federal Rule of Civil Procedure 56(d) to allow
time to complete discovery. (Doc. # 323.) Plaintiffs also filed a Preliminary
Response to Defendants' Motion for Summary Judgment Motion. (Doc. # 324.)
On May 17, 2013, Defendants filed a reply in support of their Motion for Summary
Judgment. (Doc. # 328.)

<u>STANDARD OF REVIEW</u>

Summary judgment is granted under Federal Rule of Civil Procedure
56 when "the pleadings, the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u>
<u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005); <u>Addisu v. Fred</u>
<u>Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000). A main purpose of summary
judgment is to dispose of factually unsupported claims and defenses. <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986).

Summary judgment must be granted against a party that fails to
demonstrate facts to establish what will be an essential element at trial. <u>See</u> <u>id.</u> at
323. A moving party without the ultimate burden of persuasion at trial—usually,

but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Co., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings. Porter, 419 F.3d at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers. S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003). "[A]t least some 'significant probative evidence'" must be produced. T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134. Further, the Ninth Circuit has

"refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (citing Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996)). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1078 (9th Cir. 2003).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id.; see also Nelson v. City of Davis, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (citations omitted). However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

7

DISCUSSION

I.     Motion for Summary Judgment

       A.     Patent Infringement Claim

               In their previous Motion for Summary Judgment (doc. # 111),

Defendants argued that Plaintiffs' claim for patent infringement failed as a matter

of law because CWC had a license to use the Method Patent.  In its March 30, 2007

Order Granting in Part and Denying in Part Summary Judgment, the Court

observed that, even if the license were a complete defense to <u>use</u> of the Method

Patent, it would not necessarily preclude other theories of infringement—namely,

infringement of the patentee's exclusive right to import, make, sell, or offer to sell

the patented method and inducement of such infringement under 35 U.S.C.

§ 271(b).  (Doc. # 143.)  Noting that such infringement theories were novel, the

Court left it to Plaintiffs to show, following further factual development, whether

such claims might legally proceed.  (<u>Id.</u> at 13.)

               In the instant Motion for Summary Judgment, Defendants make two

new arguments.  They contend that they are not liable for patent infringement

because (1) Defendants never used the Method Patent in the United States; and (2)

the Method Patent does not cover "bingo, keno, lottery or sports betting" under the

doctrine of file wrapper estoppel.  (Doc. # 312.)  Each argument is discussed in

turn.

        i.       No Infringement Due to Use Outside the United States

        1.       Claim Construction

In patent infringement litigation, the Court first determines the scope and meaning of the patent claims asserted. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citing Markman v. Westview Instruments, Inc., 517 U.S. 370, 388–89 (1996)). In construing a claim, the court generally limits itself to the construction of only those terms "that are in controversy, and only to the extent necessary to resolve the controversy." Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999).

To determine the scope and meaning of disputed claim terms, the court "look[s] to the words of the claims themselves, the written description, the prosecution history, and, finally, any relevant extrinsic evidence." Zircon Corp. v. Stanley Black & Decker, Inc., 452 F. App'x 966, 972 (9th Cir. 2011) (citing Phillips v. AWH Corp., 415 F.3d 1303, 1312–19 (Fed. Cir. 2005) (en banc)). The court's analysis generally begins with the language of the claim itself. See Vitriolics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The words of a patent claim "are generally given their ordinary and customary meaning." Id. The ordinary and customary meaning of a claim term is the

meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.  <u>Phillips</u>, 415 F.3d at 1313.  Additionally, "[i]t is . . . entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." <u>Id.</u> at 1317.  The final piece of intrinsic evidence which the court may consider is the prosecution or file history.  <u>Zircon</u>, 452 F. App'x at 972.  The prosecution history "consists of all express representations made by or on behalf of the applicant to the [patent] examiner to induce a patent grant."  <u>Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.</u>, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (citation omitted) (internal quotation marks omitted).

In this case, the Method Patent contains three independent claims.  On March 13, 1997, during patent prosecution, Plaintiffs' counsel stated the following in the "Remarks" section of Plaintiffs' "Amendment" to the Method Patent:

> Also at the interview the examiner and the undersigned reached agreement to incorporate player interaction into the remaining independent claims 21, 24 and 39 . . . . The remainder of the pending claims depend directly or indirectly from allowable claims 21, 34, and 39.

(Doc. # 24, Ex. F at 132.)  Claim 21 became renumbered Claim 1 of the Method Patent issued; Claim 34 became Claim 14; and Claim 39 became Claim 19.  (<u>Id.</u> at 120, 123, 126.)  As the above quote demonstrates, the three independent claims of

the Method Patent all incorporate "player interaction," and the Court's analysis as
to Claim 1 applies with equal force to each of the independent claims.

Relevant to this case, "Step ix" of Claim 1 provides:

> (ix) the player over the first information line interacting with the
> casino to control the play of the game until an outcome is
> obtained . . . .

(Doc. # 312-1 at col. 8:44–46.)  In other words, this step requires the player to use
his computer to perform whatever actions are necessary over the internet to
advance play of the game taking place at the live casino.  For example, in a game
of blackjack, the player uses his computer to indicate over the internet to the live
casino that he wishes to hit (be dealt an additional card) or stand, until the game
ends.  Under the plain language of the claim, "interacting with the casino" means
that something has to happen at the casino, wherever the casino is located.

Claim 1 also includes a step in which the party hosting the online
casino game determines whether a player's bet was won or lost, and the player
views the outcome of the frame as it occurred at the live casino to confirm the
result.  "Step x" of Claim 1 provides:

> (x) determining from the outcome whether the player's bet is won or
> lost, said player viewing the live play of the game at the display to
> confirm the outcome . . . .

(Doc. # 312-1 at col. 8:47–49.)  This method step requires action at the live casino

11

because someone, or some mechanism, has to determine whether the player's bet was won or lost, and then indicate this to the web servers.  In short, to infringe the Method Patent, there must be activity at the Live Casino.  Indeed, this is clear from the very title of the Method Patent, "Method of Participating in a Live Casino Game from a Remote Location."  (See Doc. # 312-1.)

### 2.   Infringement Analysis

As described above, the Method Patent requires players to interact with the live webcam casino.  Defendants maintain that, because the Live Casino and CWC's computer servers were located in Costa Rica, and thus not all of the method steps were performed in the United States, they cannot be liable for patent infringement.

In NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282 (Fed. Cir. 2005), the Federal Circuit held that a method patent cannot be infringed unless all of the method steps are performed in the United States.  Id. at 1318 (holding that "a process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country") (emphasis added).  The defendant in that case, Research In Motion, Ltd. ("RIM"), was the maker and provider of BLACKBERRY® cellular phones and services to customers in the United States.  See id. at 1289–90.  The method at issue involved the transmission

12

of messages from sender to recipient, which, in the case of BLACKBERRY

phones, typically involved senders and recipients who were both located in the

United States.  See id. at 1317.  All steps occurred in the United States except for

one, which involved the transmission of all messages through a relay in Canada.

Id. at 1318.  Since one of the steps of the patented method was performed outside

the United States, the Federal Circuit held there could be no liability imposed for

"use" of the method patent under 35 U.S.C. § 271(a).  Id.  The court also held that

the method was not sold or offered for sale within the meaning of § 271(a) because

"RIM's performance of at least some of the recited steps of the asserted method

claims as a service for its customers cannot be considered to be selling or offering

to sell the invention covered by the asserted method claims."  Id. at 1321.

There is no dispute that the Live Casino—and the computer servers

making it available to players around the world through the internet—were located

in Costa Rica at all relevant times.  (See Piche Decl. ¶ 4; FAC ¶ 89 ("Defendants

and each of them have attempted to evade liability for their infringement of

Plaintiffs' patented method by locating portions of their operations offshore . . . .

").)  The players had to interact with the Live Casino to have their wagers

processed, etc., through CWC's facilities in Costa Rica.  Thus, at no point was

every step of Plaintiffs' method practiced in the United States.  Accordingly,

13

Defendants did not "use" the Method Patent in the United States within the meaning of 35 U.S.C. § 271(a) and cannot be liable for infringement on that basis.

Likewise, there can be no liability for the "sale" of the Method Patent in this case under 35 U.S.C. § 271(a).  In NTP, the Federal Circuit explained: "[T]he legislative history of section 271(a) indicates Congress's understanding that method claims could only be directly infringed by use."  NTP, 418 F.3d at 1320. However, the NTP court expressly declined to decide whether method claims may be infringed under the "sells" or "offers to sell" prongs of § 271(a).  Id. at 1320–21.  Nevertheless, just as in NTP, the fact that Defendants sold their services to online players located in the United States does not create liability for the "sale" of the patented method, because CWC's activities at the Live Casino were performed as "a service for its customers."  See id. at 1321.  Moreover, as a matter of law, "[a] method claim is directly infringed only by one practicing the patented method."  Joy Tech. v. Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993); accord BMC Resources, Inc. v. Paymentech, L.P., 498 F.3d 1373, 1378 (Fed. Cir. 2007) ("Direct infringement requires a party to perform or use each and every step or element of a claimed method or product.").  "Merely selling a product that requires the seller to practice only some of the steps of the claimed method as a service to the buyer is not enough" to impose liability for direct infringement.  Transamerica

Life Ins. Co. v. Lincoln Nat'l Life Ins. Co., 597 F. Supp. 2d 897, 925 (N.D. Iowa 2009) (citing NTP, 418 F.3d at 1320–21).  Thus, there is no liability for direct infringement on the part of Defendants in this case for selling or offering to sell the Method Patent.

Additionally, liability under 35 U.S.C. § 271(g) cannot be imposed upon Defendants in this case.  Section 271(g) prohibits a person from importing into the United States or offering to sell, selling or using within the United States "a product which is made by a process patented in the United States."  35 U.S.C. § 271(g).  The NTP court explained that § 271(g) "does not cover the production of intangible items" and held that the "transmission of information"—namely, "email packets"— to the RIM server in Canada did not entail the manufacturing of a product.  418 F.3d at 1323.  The NTP court concluded that, as a matter of law, § 271(g) was inapplicable to the asserted method claims.  Id. at 1324.  Similarly, CWC's live webcam casino services never involved the manufacture of a physical product, but rather the transmission of information.  Accordingly, § 271(g) is inapplicable in this case.

Plaintiffs essentially concede that their claims under 35 U.S.C.

§ 271(a) and § 271(g) fail,[1] instead arguing only that Defendants are liable for inducement of infringement 35 U.S.C. § 271(b).  "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1378 (Fed. Cir. 2005) (citation omitted) (internal quotation marks omitted).

Plaintiffs contend that the Federal Circuit's en banc opinion in Akamai Techs., Inc. v. Limelight Networks, Inc., 692 F.3d 1301 (Fed. Cir. 2012), is controlling in this case.  In Akamai, the Federal Circuit held:

> If a party has knowingly induced others to commit the acts necessary
> to infringe the plaintiffs' patent and those others commit those acts,
> there is no reason to immunize the inducer from liability for indirect
> infringement because the parties have structured their conduct so that
> no single defendant has committed all the acts necessary to give rise
> to liability for direct infringement.

Id. at 1309.  In other words, while all the acts necessary to give rise to liability for direct infringement must be committed, it is not necessary to prove that all the

---

[1]  Since the Court's March 30, 2007 Order, the Federal Circuit has held that liability under 35 U.S.C. § 271(f) does not apply to method patents as a matter of law.  Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 576 F.3d 1348, 1364 (Fed. Cir. 2009).  Accordingly, Plaintiffs' claim under 35 U.S.C. § 271(f) fails as a matter of law.

steps were committed by a <u>single</u> entity.  See <u>id.</u> at 1308–09; <u>Move, Inc. v. Real</u>

<u>Estate Alliance Ltd.</u>, 709 F.3d 1117, 1123 (Fed. Cir. 2013).

   Plaintiffs' reliance upon <u>Akamai</u> is misplaced, because not <u>all</u> of the

necessary acts for infringement have been committed, either singly or collectively

by any combination of actors.  As described above, there is no liability for direct

infringement under 35 U.S.C. § 271(a), because at least one of the method steps

was performed outside the United States.  Plaintiffs do not argue that CWC's Live

Casino and servers were located anywhere other than Costa Rica or that interaction

with the Live Casino and servers was not a necessary step in carrying out the

Method Patent.  Thus, to the extent Plaintiffs assert that "Defendants have, in

instances where users in the United States have gambled online using the CWC

system, induced parties to <u>collectively perform all of the steps</u> of the claimed

method in the United States," this statement is not supported by the evidence.  (See

Doc. # 323 at 12.)  Conclusory allegations unsupported by factual data cannot

defeat summary judgment.  <u>Rivera v. Nat'l R.R. Passenger Corp.</u>, 331 F.3d 1074,

1078 (9th Cir. 2003).  Regardless of where a player may have been located, CWC's

Live Casino and computer servers were always located in Costa Rica, and thus key

method steps occurred outside of the United States.

   Moreover, to the extent Plaintiffs contend that acts of inducement may

be performed outside the United States, this argument is unavailing in this case because there is no collection of acts leading to <u>direct</u> infringement. Accordingly, there can be no liability for <u>inducement</u> to infringement. <u>See</u> <u>Akamai</u>, 692 F.3d at 1308 ("An important limitation on the scope of induced infringement is that inducement gives rise to liability only if the inducement leads to actual infringement.").

Plaintiffs also contend that Defendants induced infringement of the Method Patent through their licensees (as opposed to players) "who operate on-line gambling sites that engage in sporting events, bingo, keno, and/or lottery." (Doc. # 143 at 18.) The Court previously declined to grant Defendants summary judgment on this claim, finding that a genuine issue of material fact existed with respect to whether CWC exceeded the scope of its license agreement with Plaintiffs by providing hyperlinks to CWC's licensees' websites, thus enabling infringing gaming activities. (<u>Id.</u> at 19–20.)

The record now indicates that CWC never provided hyperlinks offering live webcam casino gaming at any location apart from the Live Casino located in Costa Rica. CWC only linked to licensees who offered live webcam casino gaming through a "skin" (i.e., a private label brand), and the experience of players at licensee websites was always the same as the experience of players at

18

CWC's website—namely, they interacted with the Live Casino in Costa Rica. Consequently, live webcam casino gambling, even if done through a CWC licensee's website, also required at least one step occurring outside the United States. Accordingly, it could not, as a matter of law, constitute infringement of the Method Patent; and where there is no infringement of a patent, there can be no inducement to infringe the patent. See Akamai, 692 F.3d at 1308.

To the extent that CWC's licensees may have offered games claimed to be contractually prohibited by means other than live webcam casino gaming, Plaintiffs have no claim on such activity since their patent covers only live webcam casino gaming. In sum, there is no infringement of the Method Patent by any CWC licensee, and no inducement to infringement by Defendants.

      ii.      <u>The Method Patent Does Not Cover Bingo, Keno, Lottery or Sports Betting</u>

Plaintiffs' entire action is premised on the allegation that Defendants infringed the Method Patent through their operation of an online gambling website that included sports betting, lottery, keno, and bingo games and through the distribution of online gambling software that also included sports betting, lottery, keno, and bingo games. (FAC ¶¶ 88–89.) Defendants argue, however, that the Method Patent cannot be infringed through the performance of non-interactive

19

games—namely, sports betting, lottery, keno, and bingo[2]—because these were given up by the inventor, Molnick, during the course of patent prosecution.  As such, Defendants contend that the doctrine of "file wrapper estoppel," also known as "prosecution history estoppel," applies in this case.

However, the doctrine Defendants actually invoke is that of "prosecution history disclaimer."  The Federal Circuit recently distinguished the doctrines of "prosecution history estoppel" and "prosecution history disclaimer."  See Trading Techs. Int'l, Inc. v. Open E Cry, LLC, No. 2012-1583, --- F.3d ----, 2013 WL 4610693, at *10 (Fed. Cir. 2013).  On the one hand, the court explained that "[p]rosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution."  Id. (citing Pall Corp. v. Hemasure Inc., 181 F.3d 1305, 1311 (Fed. Cir. 1999)).  On the other hand, explained the court, prosecution disclaimer "affects claim construction

_____

[2]  Bingo, lottery, keno, and sports betting are non-interactive games, because the player cannot control the outcome of the game.  (Doc. # 312 at 20.)  For example, in sports betting, the player has no control over the horses running a race.  (Id.)  His role is entirely passive, and he can do no more than bet on an outcome over which he has no control.  (Id.)  By contrast, blackjack is an example of an interactive casino game.  (Id.)  In blackjack, a player interacts with the dealer, indicating, for example, whether he wishes to receive an additional card (hit) or stay with the cards he has already been dealt (stand).  (Id.)

and applies where an applicant's actions during prosecution prospectively narrow the literal scope of an otherwise more expansive claim limitation." Id. (citing Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323–24 (Fed. Cir. 2003)). Here, Plaintiffs make no argument for infringement under the doctrine of equivalents. Instead, Defendants argue that Plaintiffs' method claims exclude non-interactive games based on the amendment history of the Method Patent. Accordingly, Defendants are, in effect, invoking the doctrine of prosecution history disclaimer.

When the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered.  Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090, 1095 (Fed. Cir. 2013).  "[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, [and] he is by implication surrendering such protection."  Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1304 (Fed. Cir. 1997).  Amendments made during prosecution to overcome prior art can serve to narrow claim construction because "[t]he public has a right to rely on such definitive statements made during prosecution."  See Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1347 (Fed. Cir. 1998).

21

Here, publically available records show that all of the claims of the Method Patent, as originally filed, were rejected by the United States Patent and Trademark Office ("PTO") in an Office Action dated January 10, 1997.  (See Doc. # 24 at 117.)  More specifically, the PTO rejected Molnick's claims under 35 U.S.C. § 102(b) because they were anticipated by a prior patent issued to "Hedges et al." in 1982 as Patent No. 4,339,798 (the "Hedges Patent").  (Id.; see also Doc. # 312-3.)  Despite the overlap between the two patent methods, the Hedges Patent did not appear to provide for the possibility of interactive casino games—i.e., games where the player does not just wager on the outcome of a game but the player also participates in the game.  Rather than oppose the examiner's finding that the Hedges Patent anticipated his invention, Molnick limited his claims by way of amendment.  (Doc. # 24 at 117.)  In amending the patent claims, Molnick's patent counsel wrote:

> Also at the interview the examiner and the undersigned reached agreement to incorporate player interaction into the remaining independent claims 21, 34 and 39.  Accordingly applicant submits herewith these new claims reciting a player interaction step to control the play of the game.  (Claim 21, step (ix), claim 34, step (x) and claim 39, step (xi)).

(Doc. # 24 at 132 (emphasis added).)  With the new step (ix)[3] and its equivalent in

---

[3]  Step (ix) of Plaintiffs' Method Patent provides: "(ix) the player over the
(continued...)

the other independent claims, Plaintiffs' Method Patent was issued by the PTO. (See Doc. # 312-3.)

Accordingly, the Court finds that, by limiting his claims to interactive casino games, Molnick gave up rights to non-interactive games. Lottery, keno, bingo, and sports betting do not involve player interaction, but rather passive betting on random number draws players do not control. It follows that Defendants could not infringe the Method Patent by operating a website and licensing software that permitted sports betting, lottery, keno, and bingo games because these activities are excluded from the Method Patent. Additionally, because Defendants' underlying activities were not infringing, it makes no difference whether "CWC 'refer[red]' end users to websites of affiliates through hyperlinks for the purpose of 'enabling' such . . . activities" (see doc. # 143) nor whether the parties intended to encompass such referrals in the HGN Contract.

Accordingly, the Court grants Defendants summary judgment on Plaintiffs' claims for patent infringement.

B.    Preliminary and Permanent Injunction

Plaintiffs seek a preliminary and permanent injunction preventing

_____

[3](...continued)
first information line interacting with the casino to control the play of the game until an outcome is obtained . . . ." (See Doc. # 312-3 at col. 8:44–46.)

Defendants "from infringing upon Plaintiffs' Method Patent."  (FAC ¶¶ 106–08.)

Previously, the Court declined to dismiss Plaintiffs' request for a permanent injunction on ground that Plaintiffs' patent infringement claim was not being dismissed.  (Id. at 23.)  However, because the Court now dismisses Plaintiffs' patent infringement claim in its entirety, Plaintiffs' claim for injunctive relief fails as a matter of law.

C.    Claim for Accounting

Plaintiffs also "respectfully request that each Defendant be required to provide a verified accounting of all transactions processed by them through their Live Casinos from the date of their inception through the present date."  (FAC ¶ 110.)

The Court previously declined to dismiss Plaintiffs' cause of action for an accounting on ground that Plaintiffs' patent infringement claims were not being dismissed.  (Doc. # 143 at 23.)  Because the Court now dismisses Plaintiffs' patent infringement claims, Plaintiffs' cause of action for an accounting is also dismissed.  Additionally, the Court notes that, since the information sought by Plaintiffs is contained in the database produced to Plaintiffs, Plaintiffs' request for an accounting appears to be moot.

D.    Breach of Contract Claim

24

Plaintiffs contend that Defendants breached the HGN Contract by sublicensing the CWC Software to CWC licensees without excluding bingo, keno, lottery or sporting events.  (FAC ¶ 114–15.)

A careful reading of the HGN Contract reveals that it does not prevent CWC from licensing the CWC Software to third parties for bingo, keno, lottery or sporting events.  The contract merely defines "CWC Software" as "any software owned or licensed by CWC, which CWC makes generally available to its customers, and which enables CWC and CWC Licensees to provide any games over computer networks to end users, excluding Bingo, Keno, Lottery and all sporting events."  (HGN Contract § 1.4.)  There is no contractual provision of the HGN Contract imposing an affirmative duty upon Defendants <u>not</u> to allow, enable or induce third parties to use the CWC Software for bingo, keno, lottery or sports betting.  Rather, the HGN Contract is a straightforward license agreement that provides CWC protection from a patent infringement lawsuit to the extent of its subject matter. (<u>See</u> <u>id.</u> § 2.1 (granting CWC "a perpetual, exclusive, royalty-free worldwide license to use the Licensed Technology" and the right "to grant sublicenses therein to CWC Resellers, CWC Licensees, and End Users").)

Thus, insofar as Plaintiffs allege that Defendants impermissibly licensed CWC Software for bingo, keno, lottery or sports betting, Defendants did

so, at most, without the protection of the HGN Contract.  Consequently, if

Defendants' conduct was wrongful, as alleged, then it was wrongful as

contributory patent infringement, or inducement to infringe, or some other tort.

The HGN Contract expressly provides that Plaintiffs "retain[ed]" all rights not

covered by the agreement (id. § 2.1), and Plaintiffs have in fact exercised such

rights by suing Defendants for patent infringement.

      Moreover, even assuming that the HGN Contract prohibits the use of

the Method Patent with respect to "bingo, keno, lottery and sporting events,"

Plaintiffs' breach of contract claim fails under the doctrine of patent misuse.

Patent misuse occurs when a patentee tries to "impermissibly broaden[] the

'physical or temporal scope' of the patent grant with anticompetitive effect."  Va.

Panel Corp. v. MAC Panel Co., 133 F.3d 860, 868 (Fed. Cir. 1997) (quoting

Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1001 (Fed. Cir. 1986)).  The

"patent misuse doctrine is an extension of the equitable doctrine of unclean hands,

whereby a court of equity will not lend its support to enforcement of a patent that

has been misused."  B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1427

(Fed. Cir. 1997).

      The Supreme Court has described the patent misuse doctrine as it

applies to patent licensing agreements as follows:

26

> [T]here are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee.  Among other restrictions upon him, he may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly.

Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 136 (1969).  The Federal Circuit has held that "[w]hen the patentee has used restrictive conditions on licenses or sales to broaden the scope of the patent grant," the accused infringer "may invoke the doctrine of patent misuse to defeat the patentee's claim."  Princo Corp. v. Int'l Trade Comm'n, 616 F.3d 1318, 1328 (Fed. Cir. 2010).  When patent misuse occurs, "as in the case of price-fixing conditions and tying restraints," the patentee "loses its right to sue for infringement or breach of contract."  See id.; see also Avocent Redmond Corp. v. Raritan Americas, Inc., No. 10 Civ. 6100, 2012 WL 3114855, at *13 (S.D.N.Y. July 31, 2012) ("If a party seeks to enforce an invalid or unenforceable patent or attempts to use its market position to secure license payments on products that are not within the scope of its patents, patent misuse will be a defense to breach of contract."); Cohn v. Compax Corp., 451 N.Y.S.2d 171, 175 (2d Dep't 1982) (holding that patent misuse can serve as a defense to breach of contract).

Here, in order to obtain a patent, Molnick struck a bargain with the

PTO to limit his method claims to interactive games. No sooner had Molnick

obtained his patent, however, than he sought to "broaden[] the physical or temporal

scope of the patent" by negotiating a license agreement with CWC excluding the

"patented" method for sports betting, lottery, keno, and bingo—despite the fact

that this was subject matter he had specifically and knowingly given up in the

course of patent prosecution. At his deposition, Molnick testified that he did not

license non-interactive games under the Method Patent "to keep them for myself

for the right time." (See Doc. # 312-4 ("Molnick Dep.") at 281:6–7.) Molnick

later testified that he licensed sports betting to a third party for a paid license fee

(id. at 295:19, 296:15–16) and declined an offer from Ladbrokes, an online gaming

company, to license sports betting because it did not offer enough money (id. at

293:8, 294:10–14). In other words, Plaintiffs purposefully attempted to exclude

subject matter that was beyond the scope of the Method Patent from the license

granted to CWC, so that they could license that subject matter to others for money.

Accordingly, if Plaintiffs' interpretation of the HGN Contract is

correct, they improperly sought to keep CWC out of a market that it had every

right to enter. Because Plaintiffs bring a claim for breach of contract to enforce

provisions of a license agreement that impermissibly encompasses subject matter

they affirmatively surrendered during the course of patent prosecution, the doctrine

28

of patent misuse bars their claim.  Thus, the Court finds that Defendants are entitled to judgment as a matter of law on Plaintiffs' breach of contract claim.

        E.    <u>Claim for Intentional Interference with Contractual Relationships</u>

Plaintiffs allege that certain of Defendants' licensees knowingly "encourag[ed]" Defendants to provide sublicensed CWC Software that did not exclude "Bingo, Keno, Lottery and all sporting events" in violation of the HGN Contract.  (FAC ¶¶ 118–20.)

As explained above, the HGN Contract did not actually cover bingo, keno, lottery, and sports betting.  Accordingly, no claim for interference with contractual relations can be premised on it as a matter of law.  See <u>J.J. Indus., LLC v. Bennett</u>, 71 P.3d 1264, 1267 (Nev. 2003) (explaining that a plaintiff must show "intentional acts intended or designed to disrupt the contractual relationship" and "actual disruption of the contract" to prevail on a claim for contractual interference).

Moreover, insofar as Plaintiffs' intentional interference with contractual relations claim is <u>against Defendants</u>, who are not sublicensees of the HGN Contract, it fails.  "In Nevada, a party cannot, as a matter of law, tortiously interfere with his own contract."  <u>Blanck v. Hager</u>, 360 F. Supp. 2d 1137, 1154 (D. Nev. 2005) (citing <u>Bartsas Realty, Inc. v. Nash</u>, 402 P.2d 650, 651 (Nev. 1965)).

Moreover, "agents acting within the scope of their employment, i.e. the principal's interest, do not constitute intervening third parties, and therefore cannot tortiously interfere with a contract to which the principal is a party."  Id.

Here, CWC entered into the HGN Contract with Plaintiffs, and Piche and Eyeball Networks acted as CWC's agents by assisting it in licensing the webcam casino software.  (See FAC ¶ 37 ("Defendants Piche, Eyeball Network Games, . . . and CWC have licensed its webcam casino software and services.").)  Accordingly, because Defendants are not "third parties" in relation to the HGN Contract, Plaintiffs' intentional interference with contract claim against them fails.  The Court, therefore, grants Defendants summary judgment on this claim.

II.     Motion to Defer Motion for Summary Judgment

Plaintiffs have filed a motion pursuant to Federal Rule of Civil Procedure 56(d) to defer Defendants' Motion for Summary Judgment in order to "allow time to complete discovery."  (Doc. # 323.)  However, it is clear that additional discovery will not alter the outcome of this case.  Plaintiffs assert that "[d]iscovery is need to prove instances of infringement that occurred in the United States."  (Id. at 13.)  However, as set forth above, even if Plaintiffs were able to prove that players in the United States gambled online at the Live Casino in Costa Rica, at least some of the steps of the claimed method would have necessarily

30

occurred outside the United States.  Similarly, facts in the public record indicate that interactive games are not covered under the Method Patent under the doctrine of prosecution history disclaimer.

Further, this case has been pending for nearly eight years.  Plaintiffs have already obtained substantial discovery, including lists of blocked IP addresses, Defendants' software for running their system, thousands of pages of web-page information and advertising, and days of deposition of Chris Piche. Moreover, to the extent Plaintiffs complain that Defendants have caused years of delay by withholding relevant discovery, Magistrate Judge Ferenbach found otherwise in his February 14, 2013 Report and Recommendation, which this Court adopted.

<u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. # 312) and **DENIES** Plaintiffs' Motion to Defer Defendants' Motion for Summary Judgment (Doc. # 323).

IT IS SO ORDERED.

DATED: Las Vegas, Nevada, September 30, 2013.

_____
David Alan Ezra
Senior United States District Judge

31